**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | | |
|---|---|---|
| **BRANDON J. OFFICE** | : | **DOCKET NO. 2:18-cv-0093** |
| **D.O.C. # 396954** | | **SECTION P** |
| **VERSUS** | : | **JUDGE SUMMERHAYS** |
| **W.S. McCAIN** | : | **MAGISTRATE JUDGE KAY** |

**REPORT AND RECOMMENDATION**

Before the court is a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by Brandon J. Office, who is proceeding pro se in this matter. Office is an inmate in the custody of the Louisiana Department of Public Safety and Corrections and is currently incarcerated at Raymond Laborde Correctional Center in Cottonport, Louisiana. W.S. McCain, warden of that facility and respondent in this matter, opposes the petition and has produced a supplemental response in accordance with this court's order to more fully and accurately cite the record. Doc. 18; *see* docs. 33, 34. The respondent has also filed a supplemental brief on the issue of equitable tolling, and the petitioner has responded. *See* docs. 38, 41.

This petition is referred to the undersigned for review, report, and recommendation in accordance with 28 U.S.C. § 636 and the standing orders of the court. For the following reasons **IT IS RECOMMEDED** that the petition for writ of habeas corpus be **DENIED** and **DISMISSED WITH PREJUDICE**.

# I.
## BACKGROUND

### A. Conviction

Office was charged by bill of information in the Thirtieth Judicial District Court, Vernon

Parish, Louisiana, with one count of armed robbery with force while armed with a firearm, a

violation of Louisiana Revised Statute § 14:64; and one count of aggravated kidnapping by force

with the use of a firearm, a violation of Louisiana Revised Statute § 14:44. Doc. 25, p. 14. The

second count was subsequently amended to second degree kidnapping, a violation of Louisiana

Revised Statute § 14:44.1. *Id.* Both charges related to an incident on July 1, 2005. *Id.* The Louisiana

Third Circuit Court of Appeal summarized the events as follows:

> The victim, Antonio Jordan, was with friends in a Leesville diner at
> approximately 1:00 a.m. on July 1, 2005. As Jordan was leaving the diner,
> Defendant approached him and asked him about his 1985 Buick, which was
> for sale. As the two men discussed the car, the victim's friends left in other
> vehicles. Defendant had an associate nearby, sitting in a white Ford Taurus.
> Defendant asked to test drive the car, but the victim refused. Defendant
> walked over to the Taurus, and when he returned, he forced the victim into
> the passenger seat of the car. Although he did not see a gun at that time, the
> victim complied because he felt a gun digging into his side. Defendant then
> got in also, and drove north on Highway 171. The driver in the white Taurus
> followed.
>
> After they got into the Buick, the victim saw Defendant's gun. Once
> the cars crossed the intersection of Highway 28, they pulled over to the right
> shoulder of the road. Testimony indicated the area north of the intersection
> is not well lit. Defendant pointed his gun at the victim and ordered him out
> of the car. The victim attempted to punch Defendant, who evaded the blow.
> The victim jumped out of the car and heard a gunshot behind him.
> Defendant then resumed his northbound route in the stolen Buick, and the
> driver in the Taurus followed him.
>
> Later, after a Many police officer tried to apprehend him, Defendant
> left the stolen car and rendezvoused with his associate in the white Taurus.
> Police apprehended Defendant further north, after a car chase.

*State v. Office*, 967 So. 2d 1185, 1187–88 (La. Ct. App. 3d Cir. 2007). Office waived his right to

a jury trial and the matter proceeded to a bench trial on April 11, 2006. Doc. 25, pp. 9, 10. The

trial concluded that day and the trial judge found Office guilty as charged. *Id.* at 10. On November 28, 2006, Office dismissed a previous request for a sentencing hearing and was sentenced to two concurrent forty-year terms of imprisonment, with the entire term for the armed robbery conviction and first two years of the term for the kidnapping conviction to be served without benefit of probation, parole, or suspension of sentence. *Id.* at 13; doc. 25, att. 4, pp. 25–27.

### B. Direct Appeal

Office sought review in the Louisiana Third Circuit Court of Appeal, raising the following assignments of error:

1. There was insufficient evidence to support the convictions.

2. The trial court erred in denying a motion for new trial based on insufficient evidence.

3. The forty-year sentences are excessive.

*Office*, 967 So.2d at 1188–94. The court reviewed all claims on the merits and affirmed the conviction and sentence. *Id.* Office then sought review in the Louisiana Supreme Court, which denied same on April 18, 2008. *State v. Office*, 978 So.2d 348 (La. 2008). He did not file a petition for writ of certiorari in the United States Supreme Court. Doc. 1, p. 2.

### C. State Collateral Review

Office filed a pro se application for post-conviction relief in the trial court on September 30, 2009.[1] Doc. 21, att. 4, pp. 5–31. There he raised several claims, including an allegation that the trial court had denied him his right to trial by jury by proceeding with a bench trial without determining that his waiver of a jury was knowing and voluntary. *Id.* After that filing he continued to submit numerous supplements until the trial court ruled on January 25, 2013. Doc. 21, att. 6, pp.

---

[1] For pro se filings by an inmate, this court uses the date that the pleading was surrendered for mailing, if available, as the date of filing. If that date is not provided, we look to the date that the pleading was received by the court.

1–2. The court ordered that a hearing be held on Office's Motion for New Trial [doc. 21, att. 5, pp. 24–34], based on newly discovered evidence and ordered the state to file a response to the claims raised in his first application for post-conviction relief. Doc. 21, att. 6, pp. 1–2. Other than that, it determined, the remaining applications/supplements should be dismissed as repetitive and/or successive. *Id.*

A hearing was held in the trial court on December 15, 2014, in which both the Motion for New Trial and Application for Post-Conviction Relief were denied. *Id.* at 3–46; doc. 21, att. 7, pp. 1–34. Office sought review in the Third Circuit, which determined that the trial court (2) had failed to rule on Office's claim that he was denied his right to trial by jury, (2) had erred in determining that his claim of ineffective assistance based on failure to investigate and call witnesses, raised in one of his supplemental applications, was repetitive and successive and (3) had failed to comply with Louisiana Code of Criminal Procedure Article 930.4(F), which requires that the court order the petitioner to state reasons for his failure to raise a claim in a prior application before dismissing a claim on that basis. Doc. 21, att. 1, p. 34. Accordingly, it granted the writ in part, remanding the case as to those claims, and denied it in all other respects. *Id.*

The state district court conducted a hearing on October 14, 2015, to address the ineffective assistance and denial of right to trial by jury claims. Doc. 24, att. 2, pp. 8–30. In that hearing the court determined that there was no merit to the jury trial claim and that the petitioner had not excused his failure to raise the ineffective assistance claim in a prior application. *Id.* at 14–18, 27–28. The petitioner sought review in the Third Circuit, which denied same on July 12, 2016, stating that it found no error to the state district court's ruling. Doc. 21, att. 9, p. 1. On November 28, 2017, the Louisiana Supreme Court likewise denied writs. *Id.* at 2–3.

### D. *Federal Habeas Petition*

Office filed the instant petition in this court on January 23, 2018. Doc. 1; *see* doc. 1, att. 2, p. 28 (providing date of mailing). Here he raises the following claims:

1. The trial court committed constitutional error by proceeding with a bench trial when the record establishes that Office did not knowingly and intelligently waive his right to trial by jury.

2. Trial counsel provided ineffective assistance by failing to subpoena witnesses to testify for the defense.[2]

Doc. 1, att. 2, pp. 13–14.

## II.
### LEGAL STANDARDS

### A. *Timeliness*

Federal law imposes a one-year limitation period within which persons who are in custody pursuant to the judgment of a state court may seek habeas review in federal court. 28 U.S.C. § 2244(d)(1). This period generally runs from the date that the conviction becomes final. *Id.* The time during which a properly-filed application for post-conviction relief is pending in state court is not counted toward the one-year limit. *Id.* at § 2244(d)(2); *Ott v. Johnson*, 192 F.3d 510, 512 (5th Cir. 1999). However, any lapse of time before proper filing in state court *is* counted. *Flanagan v. Johnson*, 154 F.3d 196, 199 n. 1 (5th Cir. 1998).

A state application is considered pending both while it is in state court for review and also during intervals between a state court's disposition and the petitioner's timely filing for review at the next level of state consideration. *Melancon v. Kaylo*, 259 F.3d 401, 406 (5th Cir. 2001). The limitations period is not tolled, however, for the period between the completion of state review and

---

[2] Office also argues that the trial court erred in denying the claims from his supplemental application for post-conviction relief as repetitive and successive, and argues that the court must consider his supplemental claims of ineffective assistance of counsel. Doc. 1, att. 2, pp. 13–14, 20–25. We do not review this as an independent claim for relief, but instead as an argument against procedural default.

the filing of the federal habeas application. *Rhines v. Weber*, 125 S.Ct. 1528 (2005). Accordingly, in order to determine whether a habeas petition is time-barred under the provisions of §2244(d) the court must ascertain: (1) the date upon which the judgment became final either by the conclusion of direct review or by the expiration of time for seeking further direct review, (2) the dates during which properly filed petitions for post-conviction or other collateral review were pending in the state courts, and (3) the date upon which the petitioner filed his federal habeas corpus petition.

### B. Exhaustion and Procedural Default

Exhaustion and procedural default are both affirmative defenses that may be considered waived if not asserted in the respondent's responsive pleadings. *E.g.*, *Cupit v. Whitley*, 28 F.3d 532, 535 (5th Cir. 1994). However, the federal district court may also consider both doctrines on its own motion. *Magouirk v. Phillips*, 144 F.3d 348, 357–59 (5th Cir. 1998). Therefore we consider any assertions by respondent under these doctrines, in addition to conducting our own review.

### 1. Exhaustion of State Court Remedies

The federal habeas corpus statute and decades of federal jurisprudence require that a petitioner seeking federal habeas corpus relief exhaust all available state court remedies before filing his federal petition. 28 U.S.C. § 2254(b)(1); *e.g.*, *Whitehead v. Johnson,* 157 F.3d 384, 387 (5th Cir. 1998). This is a matter of comity. *Ex parte Royall*, 6 S.Ct. 734, 740–41 (1886). In order to satisfy the exhaustion requirement, the petitioner must have "fairly presented" the substance of his federal constitutional claims to the state courts "in a procedurally proper manner according to the rules of the state courts." *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001); *Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988). Each claim must be presented to the state's highest court, even when review by that court is discretionary. *Wilson v. Foti*, 832 F.2d 891, 893–94 (5th Cir.

1987). The exhaustion requirement is not satisfied if the petitioner presents new legal theories or entirely new factual claims in support of his federal habeas petition. *Brown v. Estelle*, 701 F.2d 494, 495 (5th Cir. 1983).

In Louisiana the highest court is the Louisiana Supreme Court. *See* LSA–Const. art. 5, § 5(a). Thus, in order for a Louisiana prisoner to have exhausted his state court remedies he must have fairly presented the substance of his federal constitutional claims to the Louisiana Supreme Court in a procedurally correct manner, based on the same general legal theories and factual allegations that he raises in his § 2254 petition.

### 2. *Procedural Default*

When a petitioner's claim is dismissed by the state court based on state law grounds, and those grounds are independent of the federal question and adequate to support the judgment, he may not raise that claim in a federal habeas proceeding absent a showing of cause and prejudice or that review is necessary "to correct a fundamental miscarriage of justice." *Coleman v. Thompson*, 111 S.Ct. 2546, 2553–54, 2564 (1991) (internal quotations omitted). Procedural default exists where (1) a state court clearly and expressly bases its dismissal of the petitioner's constitutional claim on a state procedural rule and that procedural rule provides an independent and adequate ground for the dismissal ("traditional" procedural default) or (2) the petitioner fails to properly exhaust all available state court remedies and the state court to which he would be required to petition would now find the claims procedurally barred ("technical" procedural default). In either instance, the petitioner is considered to have forfeited his federal habeas claims. *Bledsue v. Johnson*, 188 F.3d 250, 254–5 (5th Cir. 1999). This is not a jurisdictional matter, but instead a doctrine "grounded in concerns of comity and federalism." *Trest v. Cain*, 118 S.Ct. 478, 480 (1997). The grounds for traditional procedural default must be based

on the actions of the last state court rendering a judgment. *Harris v. Reed*, 109 S.Ct. 1038, 1043 (1989). To serve as adequate grounds for a federally cognizable default, the state rule "must have been firmly established and regularly followed by the time as of which it is to be applied." *Busby v. Dretke*, 359 F.3d 708, 718 (5th Cir. 2004) (internal quotations omitted).

### C. *General Principles*

When a state court adjudicates a petitioner's claim on the merits, this court reviews the ruling under the deferential standard of 28 U.S.C. § 2254(d). *E.g.*, *Corwin v. Johnson*, 150 F.3d 467, 471 (5th Cir. 1998). That statute provides that a writ of habeas corpus shall not be granted unless the state court's adjudication resulted in a decision that was (1) contrary to clearly established federal law or involved an unreasonable application of that law, or (2) based on an unreasonable determination of the facts in light of the evidence before the state court. 28 U.S.C. § 2254(d). Where a habeas court is faced with an unexplained decision on the merits, it "looks through" that decision to the last related state court decision that provides a relevant rationale and presumes that the unexplained decision adopts the same reasoning. The respondent may rebut the presumption by showing that the unexplained decision most likely relied on different grounds than the reasoned decision below. *Wilson v. Sellers*, 138 S.Ct. 1188 (2018). Our review, however, ultimately encompasses "only a state court's decision, and not the written opinion explaining that decision." *Maldonado v. Thaler*, 625 F.3d 229, 239 (5th Cir. 2010) (internal quotations omitted); *see also Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) ("The statute compels federal courts to review for reasonableness the state court's ultimate decision, not every jot of its reasoning.") Even if the state court issues a summary denial of the claim, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 131 S.Ct. 770, 784 (2011).

The first standard, whether the state court's adjudication was contrary to or involved an unreasonable application of clearly established federal law, applies to questions of law as well as mixed questions of law and fact. The petitioner must demonstrate that the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S.Ct. at 786–87. A decision is only contrary to clearly established federal law "if the state court applies a rule that contradicts the governing law set forth [by the Supreme Court], or if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a [contrary result]." *Bell v. Cone*, 125 S.Ct. 847, 851 (2005) (quotations and citations omitted). As the Court recently emphasized, "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.' . . . Nor, of course, do state-court decisions, treatises, or law review articles." *Kernan v. Cuero*, 138 S.Ct. 4, 9 (2017) (internal citation omitted).

The second standard – whether the state court's adjudication was based on an unreasonable determination of the facts in light of the evidence – applies only to questions of fact. It is insufficient for a petitioner to show that the state court erred in its factual determination. Instead, he must demonstrate that the factual determination was objectively unreasonable, a "substantially higher threshold." *Schriro v. Landrigan*, 127 S.Ct. 1933, 1939 (2007). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 130 S.Ct. 841, 849 (2010). Instead, a presumption of correctness attaches to the state court's factual determinations and the petitioner must rebut this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## III.

### APPLICATION

#### A. *Timeliness*

Office's conviction became final on July 17, 2008, when his time for seeking review in the United States Supreme Court expired. Sup. Ct. R. 13. His application for post-conviction relief was not filed until September 30, 2009, meaning that **440 days** had accrued against § 2244(d)'s one year limit before tolling began during the pendency of his post-conviction proceedings. An additional **56 days** then accrued between the Louisiana Supreme Court's decision on November 28, 2017, and the filing of the instant petition on January 23, 2018. Accordingly, the instant petition was untimely before Office even commenced his post-conviction relief.

A petitioner may be entitled to equitable tolling of § 2244(d)'s limitations period if he can show that (1) he has been pursuing his rights diligently, and (2) some extraordinary circumstance stood in his way to prevent timely filing. *Pace v. DiGuglielmo*, 125 S.Ct. 1807, 1814 (2005). Office asserts generally that he is entitled to equitable tolling, "considering all of the evidence in support of his equitable tolling claim presented in his habeas petition . . . ." Doc. 31, p. 2. He asserts in one of his supplements to the instant petition that he retained counsel for the purposes of pursuing post-conviction relief on May 13, 2008, but that this attorney never filed the application. Doc. 28, pp. 7, 9–10. He states that he sent numerous letters to the Louisiana courts inquiring on the status of his application for post-conviction relief. *Id.* at 10. He also maintains that counsel attempted to cover her negligence by sending him a letter on July 23, 2009, stating that his application "was being filed" and advising him not to submit any filings on his own behalf. *Id.* He provides copies of his correspondence with the Louisiana Supreme Court and letters from his counsel to back up these assertions. *See* doc. 28, att. 1. These attachments also show that his attorney was investigated by the Louisiana Office of Disciplinary Counsel around the time that she

was retained by Office, and that she requested and received permanent resignation from the practice of law in lieu of discipline. *Id.* at p. 7. In the order granting counsel's request, the Louisiana Supreme Court noted that "[t]hese matters involve a pattern by respondent of accepting fees from clients in post-conviction relief matters, failing to complete the agreed upon legal tasks, and then failing or refusing to refund the unearned fees." *Id.*

The respondent concedes that equitable tolling applies to this matter. Doc. 38, pp. 16–17. Because Officer's assertions are supported by the record and it appears that he acted diligently in pursuit of his rights, we agree. Accordingly, the statute of limitations on this action was equitably tolled from May 13, 2008. No end date is given for when Office learned of counsel's failure to file an application for post-conviction relief, and so the tolling potentially extends until September 30, 2009. Therefore none of the **440 days** which accumulated between his conviction becoming final on July 17, 2008, and the filing of the application for post-conviction relief on September 30, 2009, are counted. Instead, only the **56 days** from the Louisiana Supreme Court's decision on that application to the filing of the instant petition, and so this matter is timely.

### B. *Exhaustion and Procedural Default*

The claims for relief in this matter have been exhausted in the state courts. Office's ineffective assistance of counsel claim is subject to procedural default because it was not considered on the merits in the state courts and was instead dismissed as successive/repetitive under Louisiana Code of Criminal Procedure Articles 930.4(D) and (E). However, the respondent did not raise this procedural bar in its original or supplemental response. *See* docs. 34, 38.

As noted above, the court **may** consider the issue of procedural default *sua sponte*. *Magouirk*, supra, 144 F.3d at 358. The court's discretion in deciding whether to raise the defense should be guided by "the need generally to balance the federal interests in comity and judicial

economy against the petitioner's substantial interest in justice." Brian R. Means, *Federal Habeas Manual: A Guide to Federal Habeas Corpus Litigation* § 9B:95 (Thomson Reuters 2018 ed.). Among the factors the court should consider are (1) whether the petitioner's default is obvious and uncomplicated; (2) whether the record on the procedural default issue is well developed; (3) whether the petitioner's substantive claims are patently without merit; and (4) the procedural posture of the case. *Id.* Here the potential default is obvious, but potentially complicated or excused by the evident difficulties Office faced with his post-conviction counsel. The underlying substantive claim is easily addressed on the record before the court, and the procedural posture of the case favors addressing the claim on the merits – if the court now chose to raise the issue of procedural default, it would have to give Office notice of its intention to do so and an opportunity to present his position, particularly as to grounds for excusing the default. *Wood v. Milyard*, 132 S.Ct. 1826, 1833–34 (2012). On the balance of these factors, we determine that procedural default should not be raised sua sponte by the court and so proceed to consider both of Office's claims on the merits.

### C. *Merits Consideration*

#### 1. *Whether trial court erred in failing to establish that Office had waived right to trial by jury*

Office first maintains that the trial court committed constitutional error by failing to establish whether he had waived his right to trial by jury. Doc. 1, att. 2, pp. 14–19. He exhausted this claim in his post-conviction proceedings, and the state district court issued the last decision on the merits after noting that the record showed a clear waiver. Doc. 24, att. 2, pp. 14–18. Accordingly, that court's decision is the one under § 2244(d) review.

The Constitution guarantees criminal defendants a right to trial by impartial jury for serious offenses, though the Supreme Court has long recognized that defendants may waive this right.

*Scott v. Cain*, 364 Fed. App'x 850, 853 (5th Cir. 2010) (citing *Patton v. United States*, 50 S.Ct. 253 (1930), *abrogated on other grounds by Williams v. Florida*, 90 S.Ct. 1893 (1970)). Federal standards govern the validity of a defendant's waiver of a constitutional right. *Boykin v. Alabama*, 89 S.Ct. 1709, 1712 (1969). Under federal law, the waiver of a constitutional right is not presumed from a silent record and must be knowing and intelligent. *Id.* at 1712–13; *Johnson v. Zerbst*, 58 S.Ct. 1019, 1023 (1938); *Brady v. United States*, 90 S.Ct. 1463, 1469 (1970). Accordingly, the "decision to proceed with a bench trial without the defendant's specific acquiescence runs afoul of the Constitution." *Scott*, 364 Fed. App'x at 854 (quoting *United States v. Mendez*, 102 F.3d 126, 130 (5th Cir. 1996)) (cleaned up). However, neither the Fifth Circuit nor the Supreme Court has defined any "fact-specific constitutional minima for a valid jury waiver," nor has either court "required a set colloquy before a jury waiver can be accepted." *Pierre v. Leger*, 495 Fed. App'x 403, 410–11 (5th Cir. 2012) (citing *Scott*, supra, 364 Fed. App'x at 855).

In this matter Office appeared in court on April 7, 2006, with counsel and waived his right to a jury trial. Doc. 25, p. 9. The minutes for the proceedings show that the "Court questioned defendant as to his background and education and advised defendant of his right to trial by Jury." *Id.* A transcript of the hearing was presented as an exhibit during Office's post-conviction proceedings, and confirms the summary above. *See* doc. 24, att. 2, pp. 34–48. In that hearing the court asked Office if he understood what the Constitution was and Office stated that he did not. *Id.* at 36. The court then briefly summarized the history of the Constitution and trial by jury as a constitutional guarantee, specifically explaining that Office had a right to be tried by "persons selected from the community in which the offense was committed." *Id.* at 36–37. The court then asked whether Office understood what it mean to give up a constitutional right, and Office responded that he thought he did. *Id.* at 37. At that point, defense counsel requested a recess. On

returning from recess, the following exchange took place between defense counsel James Mitchell

and the court, with Office later joining in:

> **Mitchell:** . . . Mr. Office didn't quite understand the procedure and how – and I've explained to him that basically the procedure as far as the presentation of evidence would be the same and it would just be judge making the decision rather than the jury and I think he understands all that now.
>
> **The Court:** Well, my job though is like I explained to him before, you know, the right to a jury trial is a Constitutional guarantee.
>
> **Mitchell:** Sure.
>
> **The Court:** And I need to make sure that he understands he is giving up something that's given to him in the Constitution as a right when he asked to be tried by judge rather than the jury.
>
> **Mitchell:** Yes, sir.
>
> **The Court:** You understand what I'm saying, Mr. Office?
>
> **Office:** Yes, sir[;] yes, sir.
>
> **The Court:** You know, if – that's one of the fundamental rights that we have in this country, that's the right to a jury trial in felony offenses and after talking to your – with your attorney are you – do you really want to give up that right?
>
> **Office:** Yes, sir.
>
> **The Court:** Very well.

*Id.* at 37–38. Office argues that this waiver is insufficient because he "had no prior knowledge that

Mr. Mitchell had filed the motion since he did not consult with defendant about his trial," and that

Mitchell "never explained the ramifications entailed in a waiver of a jury trial." Doc. 1, att. 2, p.

15. He also alleges that the transcript of the hearing "leaves substantial doubt about whether he

actually understood the judge's explanation of the jury trial process," based on his and counsel's

statements. *Id.* at 17–18. However, the transcript shows that a clear expression of the constitutional

right by the court and a personal and unequivocal waiver of that right by Office. Regardless of any

-14-

inadequacies in defense counsel's explanation, Office's attempts to parse words in the transcript are insufficient to undermine his final and clear assent. Accordingly, the record shows a valid waiver of Office's right to trial by jury and Office cannot show that the state court's decision was contrary to or based on an unreasonable application of federal law.

### 2. *Ineffective assistance of counsel*

Office's next claim is based on various allegations of ineffective assistance of counsel. Because the state courts did not reach the merits of this claim, it is subject to *de novo* review in this court. *E.g.*, *Porter v. McCollum*, 130 S.Ct. 447, 452 (2009).

Claims of ineffective assistance of counsel are gauged by the guidelines set forth by the Supreme Court in *Strickland v. Washington*, 104 S.Ct. 2052 (1984). Under *Strickland*, a petitioner must demonstrate: (1) that his counsel's performance was deficient, requiring a showing that the errors were so serious such that he failed to function as "counsel" as guaranteed by the Sixth Amendment, and (2) that the deficiency so prejudiced the defendant that it deprived him of a fair trial. *Id.* at 2064. The first prong does not require perfect assistance by counsel; rather, petitioner must demonstrate that counsel's representation fell beneath an objective standard of reasonableness. *Id.* Judges have been cautioned towards deference in their review of attorney performance under *Strickland* claims in order to "eliminate the potential distorting effect of hindsight." *Rector v. Johnson*, 120 F.3d 551, 563 (5th Cir. 1997) (quoting *Strickland*, 104 S.Ct. at 2065) (quotations omitted). Accordingly, the court should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

The second prong requires the petitioner to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 104 S.Ct. at 2055–56. "A reasonable probability is a probability sufficient to undermine

confidence in the outcome." *Id.* at 2056. In other words, the petitioner must show prejudice great enough to create a substantial, rather than conceivable, likelihood of a different result. *Pape v. Thaler*, 645 F.3d 281, 288 (5th Cir. 2011) (quoting *Cullen v. Pinholster*, 131 S.Ct. 1388, 1403 (2011)). "Both of [Strickland's] prongs must be proven, and the failure to prove one of them will defeat the claim, making it unnecessary to examine the other prong." *Williams v. Stephens*, 761 F.3d 561, 566–67 (5th Cir. 2014).

Office alleges that Mitchell was constitutionally ineffective because he did not interview and subpoena critical witnesses. Doc. 1, att. 2, p. 25. He alleges that he first met Mitchell on April 7, 2006, two months after Mitchell's appointment, when he appeared at the hearing on the motion to waive jury trial. *Id.* at 25–26. Office maintains that he asked Mitchell to subpoena Officer Herman Collins and Henry Moton, who would testify that Office did not have a gun when he allegedly kidnapped and robbed the victim. *Id.* at 26. Nevertheless, he maintains, the case proceeded to trial on April 11, 2006, without either witness, and Mitchell failed otherwise submit the case to any meaningful adversarial testing. *Id.* at 26–28.

Presentation of testimonial evidence is a matter of trial strategy and allegations about what witnesses might have stated are largely speculative. *Bray v. Quarterman*, 265 Fed. App'x 296, 298 (5th Cir. 2008) (citing *United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir. 1983)). Accordingly, ineffective assistance claims based on uncalled witnesses are disfavored on federal habeas review and a petitioner may only prevail on such a claim if he (1) names the witness, (2) shows that the witness was available to testify and would have done so, and (3) sets out the content of the witness's proposed testimony and shows that the testimony would have been favorable to a particular defense. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). This requirement extends to lay and expert witnesses alike. *Id.*

Moton testified at the hearing on Office's Motion for New Trial and Motion for Post-Conviction Relief, on December 15, 2014. Doc. 24, att. 9, pp. 1–3; doc. 24, att. 10, pp. 10–24. Moton stated that he had been with Office on the night of the offense, and that the two were driving a rented vehicle from Houston to Shreveport. Doc. 24, att. 10, pp. 11–12. Moton testified that, when Office got in the car, Moton asked Office whether he had a weapon or drugs on him and Office had said no.[3] *Id.* at 12–13. He also stated that he never saw Office with a weapon in his hand. *Id.* at 13.

Moton testified that he and Office had arrived together at a diner in Leesville, Vernon Parish, Louisiana, but that Office left Moton and joined another group at the diner. *Id.* at 14–15. Moton waited to see if Moton would return, then left on his own. *Id.* at 15. He maintained that he did not see Office leave the diner with the victim but later picked him (Office) up on the highway, "quite a distance away." *Id.* at 15–16. The two were later pulled over just north of Many, Louisiana, by Officer Larry Rutherford, who was looking for a suspect in a white Ford Taurus, and Office sped off after Moton had exited the vehicle. *Id.* at 16–17; *see* doc. 25, att. 7, pp. 44–47. Rutherford testified at trial that, before Office sped off, he saw a gun when he shined his light into the vehicle. Doc. 25, att. 8, pp. 2–3. Other officers joined the chase, and Office was eventually apprehended several miles to the north, between Zwolle and Converse, Louisiana, when Office pulled off the road and his vehicle caught fire. *Office*, 967 So. 2d 1185, 1187–88; *see, e.g.*, doc. 25, att. 8, pp. 8–23 (trial testimony of Sabine Parish Sheriff's Office deputy David Self).

On cross-examination, Moton admitted that he had made contradictory statements to law enforcement on the night of the crime. Doc. 24, att. 10, pp. 19–23. He had told officers at the Sabine Parish Detention Center that, when he picked up Office after they had parted ways at the

---

[3] Moton stated that this was his practice for anyone getting into his car, because "[i]f I get pulled over and they got something on them and they hide it, it's on me." Doc. 24, att. 10, p. 13.

diner, Office had come "running from out of the woods and hopped in the backseat and put a pistol to my head . . . ." *Id.* at 20. He also never mentioned asking Office if he had a gun at any prior point during this statement, and maintained that he did not know what Office had done in Vernon Parish after they parted ways. *Id.* at 22–23.

As summarized in the Third Circuit's opinion, the victim (Antonio Jordan) was at the diner with some friends on the night of July 1, 2005, and Office approached him as he was leaving, inquiring about a car he was selling. *Office*, 967 So.2d at 1187. Office requested a test drive, then forced Jordan into the passenger seat of the car. *Id.* Jordan did not see a gun at the time but felt one digging into his side. *Id.* He testified that he saw the gun later during the drive, however, and that Office pointed the gun at him.[4] *Id.*; *see also* doc. 25, att. 5, pp. 12–39 (Jordan's trial testimony). Jordan also testified that a white Ford Taurus, matching the one he had seen Moton get into after he went into the parking lot with Office, was following his car during the incident.[5] Doc. 25, att. 5, pp. 30, 35. Moton stated that he had told Office to use him as a witness, but that Office's attorney never contacted him. Doc. 24, att. 10, p. 12. Given his prior inconsistent statements to police, including on the issue of whether he saw Office with a gun that night; the fact that his testimony about Office not carrying a weapon was largely based on Office's statements; and the fact that he was also evidently lying in order to conceal his own role in the crime, it does not appear that Moton's testimony would have been in the least bit persuasive on the issue of whether Office possessed a gun during the robbery.

---

[4] Jordan provided an "[a]ffidavit of non-prosecution" in support of Office's Motion for New Trial, in which he stated that "it was just a misunderstanding," that he had not actually seen a gun during the incident, and that "[t]he district attorney led me to say he had a weapon." Doc. 21, att. 5, p. 34. At the hearing on that motion, he appeared reluctantly and testified that he had been contacted by Office's sister and asked to provide the affidavit. Doc. 24, att. 9, pp. 44–48. On cross-examination, he affirmed that he had already admitted to the district attorney that the signature on the affidavit was not his. *Id.* at 48–49. He also stated that he had told the truth about the gun when he testified at trial. *Id.*; Doc. 24, att. 10, p. 1.

[5] Jordan stated that Office forced him out of the car at gunpoint on a deserted stretch of road, and that he ran to a nearby convenience store to call for help. Doc. 25, att. 5, pp. 38–41.

Office next complains of counsel's failure to interview and subpoena Officer Herman Collins. Collins also testified at the post-conviction hearing. Doc. 24, att. 9, pp. 36–44. He stated that, on the night of the incident, he had received a call of a white vehicle proceeding on Highway 171 North toward Zwolle, Louisiana. *Id.* at 37. He laid down spikes at a bridge on the vehicle's path, which the vehicle hit and which caused three of its tires to go flat. *Id.* Once the vehicle passed, Collins picked up his spikes and followed it until the chase ended approximately four miles down the road. *Id.* at 37–38. Contrary to the trial testimony and police report of Deputy Self, Collins stated, he did not observe any gun or see any gunfire while he was pursuing Office.[6] *Id.* at 37–40; *see* doc. 25, att. 8, pp. 8–23 (Self's trial testimony); doc. 24, att. 6, p. 46 (Self police report). After Office ran off the road and fled from the vehicle, Collins participated in a twenty-minute search of the woods for him and did not mention finding or seeing a weapon. Doc. 24, att. 9, pp. 40–41; *see* doc. 24, att. 6, p. 45 (Collins police report). He also testified that there were no bullet holes in his police vehicle after the chase. Doc. 24, att. 9, p. 40.

Office, however, was not charged with use of a firearm during the police pursuit – he was charged with armed robbery and aggravated kidnapping of Antonio Jordan. As Collins admitted on cross-examination, he did not join the pursuit until it had been underway for several miles. *Id.* at 42–44. Additionally, Collins first encountered Office near Zwolle, approximately 45 miles north of where the crime began in Leesville and ten miles north of where Rutherford spotted the gun in near Many, Louisiana. *Id.* Meanwhile, as shown above, the victim testified that he both felt and saw a gun during the robbery, and only the dubious and contradictory accounts of Moton ever suggested that Office never had a weapon that night. Office cannot show that Collins's testimony

---

[6] Sabine Parish Sheriff's Office Deputy Randy Rivers, who was traveling alongside Self in a different unit, stated that his vision was obscured by smoke and debris during the car chase, but that he saw a black pistol in Office's right hand during the foot chase. Doc. 24, att. 6, p. 47.

about whether he had heard gunfire or observed Office holding a weapon during the noisy and smoky part of the car chase in which he participated would have had any persuasive value against the state's case that Office had used a weapon in his crimes against Jordan. Accordingly, he cannot show any prejudice under this portion of his claim.

Finally, Office alleges that counsel failed to submit his case to any adversarial testing. As the respondent points out, however, the defense received four sets of responses to his Motion for Discovery and Motion for Bill of Particulars. *See* doc. 25, pp. 28–33; doc. 25, att. 1; doc. 25, att. 2; doc. 25, att. 3, pp. 1–28. Although the defense rested without calling any witnesses, defense counsel subjected each of the state's witnesses, save one, to cross-examination. *See* doc. 25, att. 5, pp. 3–4 (index of trial proceedings). Office shows no specific basis on which counsel might have better prepared himself, and so fails to show any instance of deficient performance, much less prejudice under *Strickland*. Because he has not satisfied *Strickland* with respect to any of his ineffective assistance claims, he is not entitled to federal habeas relief.

### III.
#### CONCLUSION

Based on the foregoing, **IT IS RECOMMENDED** that the instant petition be **DENIED** and **DISMISSED WITH PREJUDICE**.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days from receipt of this Report and Recommendation to file any objections with the Clerk of Court. Timely objections will be considered by the district judge prior to a final ruling.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service shall bar an aggrieved party from attacking either the factual findings or the legal

conclusions accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429–30 (5th Cir. 1996).

In accordance with Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue. *See* 28 U.S.C. § 2253(c)(2). A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.

THUS DONE AND SIGNED in Chambers this 15th day of October, 2018.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE